**UNITED STATES of America, Plaintiff,**

v.

**STATE OF CALIFORNIA, Defendant.**

**No. CV 80-27-EDP.**

United States District Court,
E. D. California.

Feb. 27, 1981.

William B. Shubb, U. S. Atty., Francis M. Goldsberry, Asst. U. S. Atty., Sacramento, Cal., for plaintiff.

Roderick E. Walston, Deputy Atty. Gen., State of California, San Francisco, Cal., for defendant.

## MEMORANDUM DECISION

PRICE, District Judge.

### I

### PRINCIPAL ISSUE.

The issue before the court, simply stated, is as follows:

To what extent may the State of California, after finding that there is unappropriated water available to operate a federal reclamation multi-purpose project totally within the state, impose conditions upon the nature of the use and distribution of water appropriated by the federal government pursuant to permits issued by the appropriate agency of the State of California?

### II

### PRIOR DECISION AND THE MANDATE OF THE SUPREME COURT.

Prior reported decisions concerning the New Melones Project, the subject matter of

this litigation, are 403 F.Supp. 874 (E.D.Cal. 1975), 558 F.2d 1347 (9th Cir. 1977), and 438 U.S. 645, 98 S.Ct. 2985, 57 L.Ed.2d 1018 (1978).[1]  The Supreme Court reversed the Ninth Circuit Court and returned the case for further consideration in light of its opinion.

The Supreme Court, in its six to three decision, laid to rest for all time the absolute right of the State of California to control the appropriation of unallocated sources of water to the United States, as well as the condemnation of prior-acquired water rights by the United States.[2]

Two footnotes contained in the majority opinion are worthy of note.  Footnote 21, in its entirety, reads as follows:

"Congress did not intend to relinquish total control of the actual distribution of the reclamation water to the States. Congress provided in § 8 itself that the water right must be appurtenant to the land irrigated and governed by beneficial use, and in § 5 Congress forbade the sale of reclamation water to tracts of land of more than 160 acres.  It is conceivable, of course, that Congress may not have intended to actually override state law when inconsistent with these other provisions but instead only intended to exercise a veto power over any reclamation project that, because of state law, could not be operated in compliance with these provisions.  A project simply would not be built by the Federal Government if such a conflict existed.  As the House Report explained the workings of the

[1]. The Supreme Court opinion, 438 U.S. 645, 647, 98 S.Ct. 2985, 2987, 57 L.Ed.2d 1018, described the previous lower court decisions as follows:

"The District Court held that, as a matter of comity, the United States must apply to the State for an appropriation permit, but that the State must issue the permit without condition if there is sufficient unappropriated water.  403 F.Supp. 874 (1975).  The Court of Appeals for the Ninth Circuit affirmed, but held that § 8 of the Reclamation Act of 1902, 32 Stat. 390, as codified, 43 U.S.C. §§ 372, 383, rather than comity, requires the United States to apply for the permit.  558 F.2d 1347

(1977).  We granted certiorari to review the decision of the Court of Appeals insofar as it holds that California cannot condition its allocation of water to a federal reclamation project.   434 U.S. 984, 98 S.Ct. 608, 54 L.Ed.2d 477 (1977)."

[2]. The court did not allude to or attempt to decide whether the United States, pursuing its right of condemnation of water rights, would be forced to undertake such actions in state court or federal court.  Since no condemnation of prior water rights is involved in this case, we will not deal with that issue.

160-acre limitation and the appurtenance requirement:

" 'The character of the water rights contemplated being clearly defined, the Secretary of the Interior would not be authorized to begin construction of works for the irrigation of lands in any State or Territory until satisfied that the laws of said State or Territory fully recognized and protected water rights of the character contemplated. This feature of the bill will undoubtedly tend to uniformity and perfection of water laws throughout the region affected.' H.R.Rep.No.794, 57th Cong., 1st Sess., 6 (1902). Some support for this interpretation of the congressional intent can also be found in contemporaneous administrative material of the Department of the Interior. See, e. g., Department of the Interior, Proceedings of First Conference of Engineers of the Reclamation Service 103 (1904) ('Before the filing of the first notice of appropriation of water in any State the matter of the advisability of making such filing should be submitted to the chief engineer, because some of the State laws may be such that it is impossible to comply with them in conducting operations under the reclamation act'); Department of the Interior, Second Annual Report of the Reclamation Service 33 (1904) ('[C]areful study must be made of the effect of State laws upon each project under consideration in that particular State. It appears probable that in some of the States radical changes in the laws must be made before important projects can be undertaken.')

"In previous cases interpreting § 8 of the 1902 Reclamation Act, however, this Court has held that state water law does not control in the distribution of reclamation water *if* inconsistent with other congressional directives to the Secretary. See *Ivanhoe Irrigation District v. McCracken*, 357 U.S. 275 [78 S.Ct. 1174, 2 L.Ed.2d 1313] (1958); *City of Fresno v. California*, 372 U.S. 627 [83 S.Ct. 996, 10 L.Ed.2d 28] (1963). We believe that this reading of the Act is also consistent with the legislative history and indeed is the preferable reading of the Act. See n. 25, *infra. Whatever the intent of Congress with respect to state control over the distribution of water, however, Congress in the 1902 Act intended to follow state law as to appropriation of water and condemnation of water rights.* Under the 1902 Act, the Secretary of the Interior was authorized in his discretion to 'locate and construct' reclamation projects. As the legislative history of the 1902 Act convincingly demonstrates, however, if state law did not allow for the appropriation or condemnation of the necessary water, Congress did not intend the Secretary of the Interior to initiate the project. Subsequent legislation authorizing a specific project may by its terms signify congressional intent that the Secretary condemn or be permitted to appropriate the necessary water rights for the project in question, but no such legislation was considered by the Court of Appeals in its opinion in this case. That court will be free to consider arguments by the Government to this effect on remand. See Part V, *infra.*" *California v. United States*, 438 U.S. at 668 n. 21, 98 S.Ct. at 2997 n. 21 (emphasis added).

Footnote 25, in its entirety, reads as follows:

"As discussed earlier in n. 21, it is at least arguable that Congress *did not intend* to override state water law when it was inconsistent with congressional objectives such as the 160-acre limitation, but intended instead to enforce those objectives simply by the Secretary's refusal to approve a project which could not be built or operated in accordance with them. This intent, however, is not clear, and Congress may have specifically amended § 8 to provide that state law could not override congressional directives with respect to a reclamation project. See n. 19, *supra. Ivanhoe* and *City of Fresno* read the legislative history of the 1902 Act as evidencing Congress' intent that specific congressional directives which were contrary to state law regulating distribution of water would override that law. Even were this aspect of *Ivanhoe res nova*, we believe it would

be the preferable reading of the Act." *California v. United States*, 438 U.S. at 672 n. 25, 98 S.Ct. at 2999 n. 25 (emphasis added).

In conclusion, the Supreme Court mandated that:

"Because the District Court and the Court of Appeals both held that California could not impose any conditions whatever on the United States' appropriation permit, those courts did not reach the United States' alternative contention that the conditions actually imposed are inconsistent with congressional directives as to the New Melones Dam. Nor did they reach California's contention that the United States is barred by principles of collateral estoppel from challenging the consistency of the permit conditions. Assuming, *arguendo*, that the United States is still free to challenge the consistency of the conditions, resolution of their consistency may well require additional factfinding. We therefore reverse the judgment of the Court of Appeals and remand for further proceedings consistent with this opinion." *California v. United States*, 438 U.S. at 679, 98 S.Ct. at 3003.

The foregoing language of the Supreme Court raised two collateral issues which had been raised by the defendants before the District Court and the Ninth Circuit Court of Appeals during the early history of this case. This court dealt with those issues in its October 7, 1980 Memorandum Decision pertaining to the Motion for Summary Judgment filed on behalf of the California defendants.[3]

## III

## THE SEARCH FOR CONGRESSIONAL "DIRECTIVES".

We review as much of the legislative history as is necessary to determine the intent of Congress in the authorization and funding of the New Melones Project.

The New Melones Project was originally authorized by the Flood Control Act of 1944, 58 Stat. 887. Although the nation was still at war and materials were critically short, Congress, true to its historic custom, annually considered areas of the nation that were in need of protection from flood waters produced by the country's waterways. Congress' directives in this regard are contained in the following language of Chapter 665, Public Law 534, enacted on December 22, 1944:

"The plan of improvement for flood control and other purposes on the lower San Joaquin River and tributaries, including Tuolumne and Stanislaus Rivers, in accordance with the recommendations of the Chief of Engineers in Flood Control Document numbered 2, 78th Congress, 2nd Session, is approved, and there is hereby authorized $8 million for initiation and partial accomplishment of the plan."

The New Melones Dam as originally contemplated was of modest dimensions: A reservoir with an initial gross storage capacity of 450,000 acre-feet with provisions for possible future raising of the proposed dam to an ultimate gross storage capacity of 1,100,000 acre feet.

The original project included provision for the continued use of the then-existing Melones power plant by means of special penstock outlet facilities.

The appropriate agencies of the State of California expressed grave doubts about, if not outright opposition to, the original project.[4] Further, there developed considerable support for construction of the project by the irrigation districts and water

---

3. The named defendants in the action are: The State of California; State Water Resources Control Board; W. W. Adams, Chairman; Ronald B. Robie, Vice Chairman; Roy E. Dodson, Jane Auer, and W. Don Maughan, as members of the State Water Resources Control Board. They will be referred to collectively as the "California defendants."

4. Comments of the State of California, 1946:
"5. There is no immediate need for an additional irrigation supply in the area tributary or adjacent to the Stanislaus River in the amount which would justify the construction of the New Melones Reservoir with a capacity of 1,100,000 acre-feet at this time.
"6. Since the project is not justified on the basis of flood control and power alone,

districts which already had appropriators' rights on the Stanislaus River.[5]

As California's need for water increased, further feasibility studies continued apace. By 1958, the U. S. Bureau of Reclamation proposed further studies of the New Melones Project entailing a contemplated reservoir capacity of 2,400,000 acre-feet with additional power generating capacity. See U. S. Army Engineer District, Sacramento Corps of Engineers Review Report for Flood Control of New Melones Project, Stanislaus River, California, June 1, 1961. Both the agencies of the United States and the State of California conducted feasibility studies of the enlarged project.[6]

During this period of time, state and federal governmental agencies were not alone in conducting feasibility studies looking to the construction of the greater Melones Dam and Reservoir. By the time the matter came before the Senate Sub-Committee on Public Works for final hearing, the opponents of the enlarged New Melones Dam and Reservoir had marshalled substantial arguments in opposition to the enlargement of the original project.

By way of background, it should be noted that the residents of the Stanislaus River Basin, as well as those residing in the Tuolumne and Merced River Basins had early on availed themselves of the provisions of California law allowing the formation and operation of locally controlled and directed irrigation districts, and had developed complete and comprehensive schemes of irrigation of lands lying within the basins of the aforementioned rivers. Unlike other areas of the West, their only previous experience with the United States "being on the river" arose from the limited flood control activity by the Army Corps of Engineers. Further, the local interests had developed some very compelling historical data which seriously disputed the availability of any substantial amount of excess unappropriated water for the operation of the enlarged reservoir. Accordingly, the opponents requested a direct appropriation from the federal government to the local districts in excess of $14 million,[7] which constituted the portion of

and there is no immediate need for the amounts of irrigation water which would have to be used to make the project financially feasible, it follows that construction should be deferred until there is a justifiable need for the project for irrigation as well as flood and power purposes."

Comments of the State of California, 1948: "The comments, conclusions, and recommendations of the State of California with respect to the foregoing projects are set forth in the views and recommendations of the State, dated April 26, 1946, on the proposed report of the Secretary of the Interior entitled, 'Comprehensive Plan for Water Resources Development, Central Valley Basin, Calif.,' and are to be considered the present views of the State with respect thereto." *Central Valley Basin—A Comprehensive Report on the Development of Water and Related Resources of the Central Valley for Irrigation, Power Production, and Other Beneficial Uses in California, and Comments by the State of California and Federal Agencies.* The United States Department of the Interior—J. A. Krug, Secretary. August, 1949.

5. *Historical Survey of the New Melones Reservoir Project Area*, W. Turrentine Jackson, January, 1976.

6. In September, 1962, former Representative John J. McFall, whose area included a portion of the Stanislaus River, reported to the Senate Sub-Committee on Public Works that since 1944, "more than $500,000 has been expended by the Army Engineers, the Bureau of Reclamation, and the State of California, to study the various alternatives and to perfect a plan of action."

One of these studies, of course, was the exhaustive study completed by the Department of the Army at the request of the House of Representatives by Resolution adopted April 12, 1961. This document was issued as House Document 453, 89th Cong., 2nd Sess. (1962), and will be referred to hereafter in this opinion as H.D. 453. It ultimately became the basis for the construction of the New Melones Project, and is referred to in the final bill authorizing the project.

This document contained the comments of all affected agencies as well as those of the State of California on the enlarged project. These will be referred to in more detail, *infra*.

7. The supremacy of the federal government in the area of flood control is not challenged by the California defendants. It should be noted, however, that water impounded by the Army Corps of Engineers pursuant to their flood control activities is not necessarily released as irrigation or electrical power demands dictate. Rather, the determination is based on the ability of stream channels to handle the flow without damage to adjoining lands and structures.

the costs of the original project allocated to flood control functions. Armed with these federal funds, the opponents promised that those water and irrigation districts owning prior rights on the Stanislaus River would proceed with the construction of the originally proposed project.

Significantly, the opponents had little to say about the power production component as proposed for the expanded project, except to argue their previously expressed belief that the river would not produce sufficient water to meet power development projections made by the proponents.

In preparation for the Congressional hearings on the enlarged project, the Secretary of the Army transmitted a letter from the Chief of Engineers, Department of the Army, consisting of a complete review of the reports on the New Melones Project which had been requested by the House of Representatives pursuant to Resolution adopted April 12, 1961 (H.D. 453). All of the agencies, departments, and bureaus of the United States who had interest in, or potential jurisdiction over the project or any of its component parts were asked to comment.

All aspects of the proposal were thoroughly discussed and analyzed. Due to prior questions concerning the economic feasibility of the project,[8] much attention was given to that aspect.[9]

Total annual power benefits from the contemplated project were estimated at $3,990,000, or an average of approximately 38 percent[10] of the total annual estimated benefits. If the power benefits were removed from the formula, the cost ratio to benefits would have fallen below the permissible factor by which reclamation projects were then measured.

In response to a request for comments the State of California, over the signature of William E. Warne, Director of Water Resources, submitted its extensive reply which consisted of comments by each of the state agencies whose jurisdiction encompassed certain aspects of the operation of the proposed project.

The comments of the state agencies were as positive and enthusiastic as they were negative in 1946. The state accepted the estimated dollar benefits without question. However, it was cautious about the marketability of the power to be produced at New Melones "if proposed hydroelectric generating capacity as presently contemplated by the various private, local, state and federal agencies is constructed."[11]

The conclusions of the State of California, found in H.D. 453, pp. xi, xii, and xxxi, et seq., are as follows:

"It is concluded in the State's report that the New Melones Project is economically justified and would provide optimum multipurpose development of the waters of the lower Stanislaus River. Furthermore, it is recommended that the Congress authorize the New Melones Project for construction and operation by federal agencies subject to certain provisions specified in the State's report." H.D. 453, pp. xi, xii.

"CONCLUSIONS

"As a result of review of the New Melones Report by the various state agencies concerned, it is concluded that:

"1. Optimum multipurpose development of the New Melones Reservoir site should be made for the purposes of flood control, water conservation, hydroelectric power, recreation, and fish and wildlife. Reservoir storage capacity of 2,400,000 acre-feet as planned in the report, is adequate for these purposes.

"2. To be in conformance with objectives of The California Water Plan the

8. See n. 4, *supra.*

9. H.D. 453, Chapter IV, VI, VII and X.

10. This is an average employed by the Corps of Engineers based on a 50-year economic life.

11. This report is dated April 20, 1962. The report does not list which proposed projects it referred to in the above quotation. Hence, the record cannot reflect whether some, any, or all of said projects were eventually constructed. H.D. 453, p. xi, *et seq.*

New Melones Project should be subject to the rights of the upstream areas dependent upon waters of the Stanislaus River to use water required for the future development of such areas.

"3. On the assumption that the Hogan Service Area will be served by an exchange of water from the Folsom South Canal and from New Hogan Reservoir, estimates of future upstream depletions as presented in the New Melones Report are reasonable.

"4. The design of the dam and appurtenances are adequate and estimated project costs are reasonable.

"5. The flood control aspects of the project are urgently needed.

"6. The New Melones Project appears to be economically justified.

"7. If adequate provisions are made for land acquisition and releases of water for stream flow maintenance, the New Melones Project will protect and enhance fish, wildlife, and recreation.

"8. It has not fully been demonstrated that the channel downstream from Goodwin Diversion Dam is adequate to contain a flow of 8,000 cubic feet per second.

"9. The New Melones Project does not adequately provide for the water needs of Calaveras and Tuolumne Counties and the Bachelor Service Area.

## "RECOMMENDATIONS

"It is recommended that the proposed New Melones Project on the Stanislaus River be authorized by the Congress at an early date for construction and operation by the federal government; provided that:

"1. Recognition be given to the right of the upstream areas dependent upon waters of the Stanislaus River to develop and utilize water required for the future development of such areas.

"2. Water be released downstream for fisheries purposes and land be acquired for recreation and wildlife as previously recommended herein.

"3. Studies be authorized to develop the full potential of the North Fork of Stanislaus River, including formulation of additional features of the New Melones Project designed to serve 30,000 acre-feet of water each year initially increasing to 50,000 acre-feet by the year 2015, for use in upper Calaveras County. Further, that the Sonora-Keystone Investigation of the Bureau of Reclamation be programmed to formulate features of the New Melones Project to provide 30,000 acre-feet each year to the Sonora-Keystone area.

"4. The Bachelor Service Area be served water from the New Melones Project or by an exchange from the Folsom South Canal."

H.D. 453, pp. xxxi, et seq.

Significantly, the appropriate state agency had conceded in 1960 that: "The reservoir, when at maximum level, will inundate about twelve miles of trout stream." H.D. 453, p. 95. The state's support of the enlarged project was communicated to Congress despite the acknowledged loss of this valuable resource.

Thus, the stage was set for the showdown hearing before the Senate Sub-Committee on Public Works. Former Congressman John McFall of Manteca presented the case for the enlarged New Melones Project. Co-sponsors of the legislation authorizing said project were former Congressmen Moss, Sisk, Hagen, Miller, King, and Roosevelt who were all members of the California delegation. During the hearing communications of support from the two senators from California, The Honorable Claire Engle and The Honorable Thomas Kuechel, were added to the record. Senator Engle stated he was authorized to announce the support of Congressman Harold T. Johnson for the project.[12]

In addition, each party had lined up its lists of sponsors and filed the same with the

12. For an interesting and informative firsthand account of how Western "water" bills are steered through the Congress, see *A Congres-* *sional Record: The Memoir of Bernie Sisk*, p. 65, et seq., Panorama West, 1980.

Committee either during the hearing or in advance thereof. At the outset of the hearing, the Chairman, Senator Metcalf, read a telegram from the Honorable Edmund G. Brown, Governor of California, urging speedy construction of the enlarged project.

Finally, at the conclusion of the hearings before the appropriate committees of both Houses, Public Law 87–874, 76 Stat. 1173, 1191, was enacted on October 23, 1962 approving the New Melones Project, Stanislaus River, California, as "hereby modified substantially in accordance with the recommendations of the Chief of Engineers, in House document numbered 453, 87th Congress."

Congress, in P.L. 87–874, 76 Stat. 1173, added specific provisos, however, which are important to note:

1. That on completion of the construction of the dam and power plant by the Corps of Engineers, the project shall become an integral part of the Central Valley Project, and be operated and maintained by the Secretary of the Interior pursuant to the Federal Reclamation Laws, except that the flood control operation project shall be in accordance with the rules and regulations prescribed by the Secretary of the Army.

2. That the Stanislaus River channel, from Goodwin Dam to the San Joaquin River, shall be maintained by the Secretary of the Army to a capacity of at least 8,000 cubic feet per second, subject to the condition that responsible local interests agree to maintain private levees and prevent encroachment upon the existing channel and floodway between the levees.

3. That before initiating any diversions of water from the Stanislaus River Basin in connection with the operation of the Central Valley Project, the Secretary of the Interior shall determine the quantity of water required to satisfy all existing and anticipated future needs within that basin and the diversion shall, at all times, be subordinate to the quantity so determined.[13]

4. That the Secretary of the Army adopt appropriate measures to insure the preservation and propagation of fish and wildlife in the New Melones Project, and shall allocate to the preservation and propagation of fish and wildlife as provided in the Fish and Wildlife Coordination Act of August 14, 1946, 60 Stat. 1080, an appropriate share of the cost of constructing the Stanislaus River diversion and of operating and maintaining the same:

5. That the Secretary of the Army, in connection with the New Melones Project, construct basic recreation facilities, and acquire land necessary for that purpose. The cost of constructing such facilities and acquiring such lands would be non-reimbursable and non-returnable:

6. That the contracts for the sale and delivery of the additional electric energy available from the Central Valley Project power system, as a result of the construction of the plants herein authorized, and their integration with that system, shall be made in accordance with preferences expressed in the federal reclamation laws, except that a first preference, to the extent as needed as fixed by the Secretary of the Interior, but not to exceed 25 per centum of such additional energy, shall be given under reclamation law to preference customers in the Tuolumne and Calaveras Counties, California, for use in that county, who are ready, able, and willing, within 12 months after notice of availability by the Secretary of the Interior, to enter into contracts for energy, and that Tuolumne and Calaveras County preference customers may exercise their option in the same date in each successive fifth year providing written notice of

---

13. This language was suggested by former Congressman John J. McFall as an amendment when he appeared before the Senate Sub-Committee on Public Works, to allay the fears of opponents to the enlarged project that such a project would rob the original appropriators within the Stanislaus River Basin of the necessary water to meet their future needs.

A careful reading of Public Law 87–874 reveals that Congress was responsive to several more concerns expressed by the Water Resources Control Board of the State of California which were contained in the recommendations of that body. See *supra*, pp. 873–875.

their intention to use the energy is given to the Secretary not less than 18 months prior to said dates:

7. That the Secretary of the Army give consideration during the preconstruction planning for the New Melones Project to the advisability of including storage for the regulation of streamflow for the purpose of downstream water quality control.

Once the New Melones Project was approved, the Federal agencies were next required to seek permission from the State to appropriate the requisite amount of water to operate the project as proposed, and Congress had to appropriate the necessary funds to construct the project. Both required inordinately long periods of time!

## IV

## THE CALIFORNIA SCHEME FOR THE APPROPRIATION OF WATER.

Prior to 1928, California recognized the English common law of riparian rights as it applied to state streams and lakes. Several decisions rendered under this doctrine made it abundantly clear that California's future growth and development could not be achieved under the restrictions imposed by said doctrine. Accordingly, in 1928, California voters amended the state Constitution to provide that beneficial use should be the keystone by which the right to use and develop state water should be measured, and that even prior riparian rights would be restricted to the extent of their potential beneficial use. The legislature was mandated to implement and direct the policy declarations contained in the constitutional amendment. Thereafter, evolving through several state government reorganizations, the power to grant rights to appropriate state waters finally vested in the State Water Resources Control Board. The composition, power, and internal statutory directives governing the Board are found in Division 1, Chapter 2, Article 3 of the Water Code of the State of California.[14]

14. Several sections of the Water Code governing the authority of the State Water Resources Control Board, all of which were in place during the debate over New Melones, deserve note. They are:

"§ 1382. Terms and conditions
All permits shall be under the terms and conditions of this division."

"§ 1390. Use of water for useful and beneficial purpose
A permit shall be effective for such time as the water actually appropriated under it is used for a useful and beneficial purpose in conformity with this division, but no longer."

"§ 1391. Enumeration of conditions of permit
Every permit shall include the enumeration of conditions therein which in substance shall include all of the provisions of this article and the statement that any appropriator of water to whom a permit is issued takes it subject to the conditions therein expressed."

"§ 1241. Reversion of unused water
When the person entitled to the use of water fails to beneficially use all or any part of the water claimed by him, for which a right of use has vested, for the purpose for which it was appropriated or adjudicated, for a period of three years, such unused water reverts to the public and shall be regarded as unappropriated water."

"§ 1242.5. Storage appropriation to benefit quality of other waters: Board's approval The board, subject to the provisions of Section 100 and whenever it is in the public interest, may approve appropriation by storage of water to be released for the purpose of protecting or enhancing the quality of other waters which are put to beneficial uses."

"§ 1243. Use of water for recreation and fish and wild-life resources
"The use of water for recreation and preservation and enhancement of fish and wildlife resources is a beneficial use of water. In determining the amount of water available for appropriation for other beneficial uses, the board shall take into account, whenever it is in the public interest, the amounts of water required for recreation and the preservation and enhancement of fish and wildlife resources.

"The board shall notify the Department of Fish and Game of any application for a permit to appropriate water. The Department of Fish and Game shall recommend the amounts of water, if any, required for the preservation and enhancement of fish and wildlife resources and shall report its findings to the board.

"This section shall not be construed to affect riparian rights."

"§ 1254. Highest and next highest uses of water
In acting upon applications to appropriate water the board shall be guided by the policy that domestic use is the highest use and irrigation is the next highest use of water."

## V

## A SURVEY OF PRIOR EXPERIENCE OF FEDERAL AGENCIES BEFORE THE STATE WATER RESOURCES CONTROL BOARD.

As might be imagined, the federal agencies have been frequent applicants before the Board. The court requested, and counsel for the California defendants voluntarily furnished the court with multiple decisions, orders, permits, licenses, and amendments thereto which were previously issued by the board. Included in the foregoing documents were three decisions which are presently in litigation, namely, Decision 1379, Decision 1485, as well as Decision 1422 which is under consideration in the instant case.

In reviewing these documents, the court found that there was a remarkable consistency about the format and procedures of the Board when dealing with prior applications of governmental entities:

1. (a) The granting clause itself was generally contained in the substantial equivalent of the following format: "The water appropriated shall be limited to the quantity which can be beneficially used and shall not exceed _____ per annum by storage to be collected from _____ of each year to _____ of _____ year." (b) The permit always contained a clause requiring that the work on the project be pursued with reasonable diligence and generally contained a mandated completion date.

2. Generally, the document permitting appropriation contained the following catch-all phrase: "All rights and privileges under this permit, including method of di-

version, method of use and quantity of water diverted, are subject to the continuing authority of the State Water Resources Control Board in accordance with law, and in the interest of the public welfare to prevent waste and reasonable use and reasonable method of use or unreasonable method of diversion of said water."

It is also noted that while the applications covered the entire gamut of possible beneficial uses for water being sought, the board apparently did not go outside the record, i. e., the proposed uses urged by the governmental entity were considered on their own merits, and not measured against some possible or theoretical future use.

The court emphasizes that the foregoing observations, while not conclusive as to the court's ultimate determination in this matter, indicate the Board's earlier course of conduct which, if not actually noted by individual congressional committees, was certainly known to those agencies of the Department of the Interior who would be required to construct and to operate the New Melones Project.

## VI

## THE APPLICATION OF THE FEDERAL GOVERNMENT FOR THE NECESSARY APPROPRIATIONS TO OPERATE THE NEW MELONES PROJECT.

Starting in 1952, both the United States government and the Department of Finance of the State of California filed several applications for the appropriation of unappropriated surplus waters produced by the Stanislaus River Basin.[15]

---

"§ 1257. Requirement that relative benefit be considered in acting on applications to appropriate water

In acting upon applications to appropriate water, the board shall consider the relative benefit to be derived from (1) all beneficial uses of the water concerned including, but not limited to, use for domestic, irrigation, municipal, industrial, preservation and enhancement of fish and wildlife, recreational, mining and power purposes, and any uses specified to be protected in any relevant water quality control plan, and (2) the reuse

or reclamation of water sought to be appropriated, as proposed by the applicant. The board may subject such appropriations to such terms and conditions as in its judgment will best develop, conserve, and utilize in the public interest, the water sought to be appropriated."

15. The applications filed by the State Department of Finance were later assigned to the State Water Resources Control Board pursuant to California Water Code § 10504. The file does not reflect why the State agencies, in 1952, filed applications to appropriate water

These filings were consistent with prior government action in obtaining water for federally authorized projects.[16] Before the State Water Resources Control Board acted upon the federal applications, construction preparation commenced immediately. Construction continued sporadically as permitted by congressional appropriation of money, the absence of Executive Orders freezing the usage of monies appropriated for the project, and the termination of litigation which halted the project.[17]

## VII

## EXPRESSIONS OF CONGRESSIONAL INTENT AFTER THE PASSAGE OF PUBLIC LAW 87–874.

It should be noted that as delays were experienced in the construction of the project, inflation, of course, was taking a steady toll of the estimated costs of the project. In addition, new power studies were undertaken resulting in a recommendation to increase the power production capacity of the enlarged reservoir. Accordingly, as the Corps of Engineers approached the Congress each year for annual and supplemental appropriations, the congressional record is replete with statements by individual congressmen as well as interested committees of the need to bring this "new clean

power source on record as rapidly as possible." Significantly, Congress did not express any parallel concern to speed up the capture and distribution of additional irrigation waters.

Finally, Congress was undoubtedly aware that in November, 1974, after the contract for the construction of the dam had been let but before construction of the dam was commenced, the people of the State of California decisively rejected a ballot proposal, placed on the ballot by California's initiative process, to make portions of the Stanislaus River a wild and scenic river, and to prohibit the erection of any structures on the river except for flood control purposes. Arguendo, Congress could have interpreted this action by California voters as being consistent with the position taken by California's representatives in 1962.

## VIII

## THE EFFECT OF THE INCLUSION OF THE NEW MELONES PROJECT WITHIN THE CENTRAL VALLEY PROJECT.

In 1948, prior to the enactment by Congress of the original authorization for a New Melones Dam, California's legislature

---

from the Stanislaus River in the amounts specified, unless one of the State applications (Application No. 14859) was for a permit to impound 980,000 acre feet for power production!

16. "Indeed, until recently, it has been the consistent position of the Secretary of the Interior and the Bureau of Reclamation, who are together responsible for executing the provisions of the Reclamation Act of 1902, that in appropriating water for reclamation purposes the Bureau must comply with State law. The Bureau's operating instructions, for example, provide:
    'State and Federal law and policy establish the framework for project formulation. *Project plans must comply with State legal provisions or priorities for beneficial use of water....* In some cases, ... State laws ... have been modified to meet specific conditions in the authorization of particular projects.' U.S. Department of Interior, Bureau of Reclamation, Reclamation Instructions § 116.3.1 (1950) (emphasis added).

'*The Reclamation Act recognizes the interests and rights of the States in the utilization and control of the States in the utilization and control of their water resources and requires the Bureau, in carrying out provisions of the Act, to proceed in conformity with State water laws.* Since the construction of a reservoir and the subsequent storage and release of water for beneficial purposes normally entails stream regulation, it is necessary to reach an understanding with the States regarding reservoir operating limitations.' *Id.* § 231.5.1 (1957) (emphasis added)."
*California v. United States,* 438 U.S. 645, 675, 98 S.Ct. 2985, 3001, 57 L.Ed.2d 1018, 1038 (1978).

17. *Environmental Defense Fund, Inc. v. Armstrong,* 352 F.Supp. 50 (N.D.Cal.1972); *Environmental Defense Fund, Inc. v. Armstrong,* 487 F.2d 814 (9th Cir. 1973); and *Environmental Defense Fund v. Armstrong,* 356 F.Supp. 131 (N.D.Cal.1973).

enacted the California Water Plan,[18] which tied together into a single integrated plan several State and Federal projects which previously had been viewed as separate and independent projects.

Undoubtedly Congress was cognizant that in 1943, California's State Legislature passed a detailed outline of the proposed Central Valley Project [19] which had its origin as a comprehensive combined water and power project to be constructed in cooperation with the federal government (Cal. Water Code §§ 11100 et seq.). Recognizing that the projects listed therein were not comprehensive, the legislature enacted Water Code § 11290, stating:

"The project includes such other units as may be from time to time added by the department to the units specifically enumerated. The department may add additional units which are consistent with and which may be constructed, maintained, and operated as a part of the project and in furtherance of the single object contemplated by this part."

and Water Code § 11295:

"§ 11295. Inclusion of additional plants and works

In addition to the works specified, the units shall include such plants and works for the generation of electric power by steam or other power, and such electric transmission lines and facilities for the sale, use and distribution of electric power as the department determines to be necessary for making a reasonable, proper, and advantageous sale, use, and distribution of electric power made available by the units."

Significantly, in Chapter 4 of the same enactment, Cal.Water Code § 11500, entitled, "Enumerated powers of department" [20] the California Legislature provided:

"Notwithstanding anything in this part to the contrary or in conflict herewith the department may do any or all of the following:

"(a) Enter into contracts with the United States for the construction, maintenance, or operation of all or any part of the project or for the financing thereof.

"(b) Enter into contracts for the acquisition by the department of the works and properties of the project or any part thereof and for the repayment by the department of the cost thereof to the United States.

"(c) Conform to such requirements, *not otherwise inconsistent with the law of this State, as may be prescribed by the United States under congressional legislation now in effect or which may hereafter be adopted or under rules and regulations duly adopted thereunder.* (emphasis added)

"(d) Transfer land owned or acquired for the construction of the project, or any part thereof to the United States pursuant to a contract with the department for such construction in conjunction with the construction of a federally authorized project utilizing the facilities with the state authorized project.

"(e) Otherwise cooperate with the United States to the end that the people of the State may receive the benefits to be deprived from the construction, maintenance, and operation of the project."

Congress' specific direction that New Melones "shall become an integral part of the Central Valley Project" is significant evidence of the expectations of Congress as to its operating functions when completed.

## IX

## CONTENTIONS OF THE PARTIES.

Other than the broad polarity of the positions of the United States and the Califor-

---

18. Water Code of the State of California, Division 6, Sections 10000 et seq.

19. The Central Valley Project, and its relation to the overall California Water Plan was the subject of a major study by the Department of the Interior. *See* n. 4, *supra*. It should be pointed out that certain portions of the Central

Valley Project had been completed and were in place when Congress enacted Public Law 87–874.

20. The "department" is the Department of Water Resources, the same agency which indicated California's support of the enlarged New Melones Project in 1962, *supra*, at n. 10 and 11.

nia defendants, there are subtle differences in their suggested resolution of this case which require particular attention.

The California defendants, for instance, argue that a "directive" is more specific than an expressed "intent of Congress." They point particularly to footnote 25 and footnote 31 in *California v. United States, supra,* as support for this position. Unfortunately, footnote 25 apparently uses "intend," "objective," "intent," and "directives," interchangeably.

Footnote 31, on the other hand, is not as free standing as is footnote 25, and the text and the footnote must be read together:

> "The United States suggests that, even if the Congress of 1902 intended the Secretary of the Interior to comply with state law, more recent legislative enactments have subjected reclamation projects 'to a variety of federal policies that leave no room for state controls on the operation of a project or on the choice of uses it will serve.' [31]"

> "[31] It is worth noting that the original Reclamation Act of 1902 was not devoid of such directives. That Act provided that the charges for water should 'be determined with a view of returning to the reclamation fund the estimated cost of construction of the project, and ... be apportioned equitably' and that water rights should 'be appurtenant to the land irrigated, and beneficial use ... the basis, the measure, and the limit of the right'; the Act also forbade sales to tracts of more than 160 acres. Despite these restraints on the Secretary, however, it is clear from the language and legislative history of the 1902 Act that Congress intended state law to control where it was not inconsistent with the above provisions."

Inferentially, the government argues that the court's task here is to determine Congressional intent as that term is traditionally used, and that the State's attempted distinction is without significance.

Both parties agree inferentially that the congressional meaning that the court must refine consists of the same types of materials, namely, HD 453, the Committee and Sub-Committee transcripts, the Committee reports,[21] copies of the appropriation applications, and copies of decisions, permits, orders and amendments of the State Water Resources Control Board. Although there is a respected school of thought that would dispense with legislative history materials as a useful tool in determining the "meaning" of a statute,[22] the court feels that if it be recognized that a judge "when operating within the fringes of meaning, is not interpreting a pre-existent intent but is exercising a legislative power, the conclusion ought to be that less attention should be paid to dictionary meanings, and more to legislative policy." [23]

We now turn to the analysis of D 1422 as measured by the legislation authorizing the project, and read in the context of the foregoing summary of information available to Congress and other federal governmental entities at the time of the enactment.

## X

## THE FEDERAL APPLICATIONS—THE CALIFORNIA DEFENDANTS' RESPONSE THERETO—DISCUSSION PERTAINING THERETO.

For the sake of convenience, Decision 1422 (hereinafter D 1422) of the State Water Resources Control Board (hereinafter "Board") is reproduced in its entirety as Appendix A to this Memorandum Decision. Further, the federal applications are grouped together according to proposed use of the water to be appropriated, rather than in the numerical order assigned by the Board.

---

21. The court wishes to express its appreciation to counsel for the Northern California Power Agency which was allowed to intervene for the limited purpose of filing an *amicus curiae* brief. Counsel for that agency supplied the court with a substantial record of the deliberations and considerations that went into the decisions pertaining to the power generation capacity at the dam.

22. R. Dickerson, *The Interpretation and Application of Statutes,* Little, Brown & Co., 1975.

23. G. Williams, *Language and the Law—III,* 61 L.Q.Rev. 293, 303 (1945).

A. Substance of the applications filed by the Bureau of Reclamation.[24]

1. Application 14858 [25]

(a) Amount of water sought to be appropriated:

(1) 8,800 cubic feet per second (hereinafter "cfs") to be stored and later applied to beneficial use.

(2) 900,000 acre feet per annum (hereinafter "afa") to be stored and later applied to beneficial use.

(b) Period of Diversion:

(1) 8,800 cfs: January 1 to December 31 of each year.

(2) 2,400,000 afa: October 1 to July 1 of each season.

(c) Proposed Uses: Irrigation, domestic, municipal, industrial, fish culture, recreation and water quality control.

(d) Flood Control: The application specifically provided that quantities of water temporarily stored and later released to provide flood control space will be in addition to the 2,400,000 afa specified in this application."

2. Application 19304

(a) Amount of water sought to be appropriated:

(1) 2,250 cfs by direct diversion

(2) 2,400,000 afa to be stored and later applied to beneficial use.

(b) Period of Diversion:

(1) 2,250 cfs: January 1 to December 31 of each year.

(2) 2,400,000 afa: January 1 to December 31 of each season.

(c) Proposed Uses: Irrigation, preservation and propagation of fish and wildlife, incidental domestic, recreational and water quality control.

(d) Flood Control: The application specifically provided that quantities of water temporarily stored and later released to provide flood control space will be in addition to the 2,400,000 afa specified in this application."

3. Application 14859 [26]

(a) Amount of water sought to be appropriated:

(1) 8,800 cfs by direct diversion

(2) 980,000 afa to be stored and later applied to beneficial use. The application specified that the 2,400,000 afa will be stored at rates equal to the flow of all presently unappropriated flows above New Melones.

(b) Period of Diversion:

(1) 8,800 cfs: January 1 to December 31 of each year.

(2) 2,400,000 afa: October 1 to July 1 of each season.

(c) Proposed Use: Power.

(d) Flood Control: The application specifically provided that quantities of water temporarily stored and later released to provide flood control space will be in addition to the 2,400,000 afa specified in this application."

4. Application 19303

(a) Amount of water to be appropriated:

(1) 6,000 cfs by direct diversion.

(2) 2,400,000 afa to be stored and later applied to beneficial use. The application specified that the 2,400,000 afa will be stored at rates equal to the flow of all presently unappropriated flows above New Melones.

(b) Period of Diversion:

(1) 8,800 cfs: January 1 to December 31 of each year.

24. During the period that this matter has been in litigation, the functions of the Bureau of Reclamation have been transferred to the Water and Power Resources Service, but we will continue to refer to it by its prior designation since D 1422 refers to it by said designation.

25. Application Nos. 14858 and 14859 were originally filed by the Department of Finance of the State of California, and were assigned to the United States Bureau of Reclamation pursuant to California Water Code § 10505. (D 1422, p. 28)

26. See n. 25, *supra*.

882

(2) 2,400,000 afa: January 1 to July 1 of each season.

(c) Proposed Use: Hydroelectric power generation at the New Melones Power Plant for the production of electrical energy for domestic, commercial and industrial use within the areas served by those systems interlocked with the Central Valley Project.

(d) Flood Control: The application specifically provided that, "Quantities of water temporarily stored and later released to provide flood control space will be in addition to the 2,400,000 afa specified in this application."

There is no explanation as to why the applications appear to be duplications as to the amount of water sought to be appropriated; all the parties concede that the amount sought for direct diversion is 6,000 cfs and the maximum storage sought was 2,400,000 afa.[27]

B. The Board's Findings

Quickly summarized, the Board's findings of fact upon which it based its ultimate order are as follows:

1. There is sufficient unappropriated water available on the Stanislaus River to satisfy the water demands of the New Melones Project as proposed, "and, subject to suitable conditions, such water may be diverted and used in the manner proposed without causing any substantial injury to any lawful user of water." D 1422, p. 10.

2. The average annual unappropriated flow is 335,000 acre-feet, and varies from zero to 1,980,000 acre-feet.

3. There is no unappropriated water in the river during the month of October, hence, no diversion shall be allowed during that month.

4. Diversions during the months of July, August, and September are prohibited by past decisions of the Board.

5. The Bureau of Reclamation has no present definite plan as to when, and at what specific locations, project water will be used for "consumptive purposes"[28] outside of the four basin counties, i. e., Calaveras, San Joaquin, Stanislaus and Tuolumne.

6. The Bureau of Reclamation has sufficient surplus water from other sources to meet future increased demands for consumptive purposes outside these counties for long periods of years.

7. The public interest requires that the use of the Stanislaus River for white water boating, stream fishing and wildlife habitat be protected to the extent that water is not presently needed for other beneficial uses.

8. Although the Bureau demonstrated a need for the full yield of the project in the four basin counties at some future date, no present contracts for such use have been negotiated. However, weighing the adverse effect of the proposed reservoir upon the aforementioned white water recreational uses, impoundment of water to satisfy that need would not presently be permitted.

9. The preservation and enhancement of fish life requires appropriation by storage of up to 98,000 afa.

10. Water quality requirements necessitate sufficient storage to enable the operators of the reservoir to meet total dissolved solids objectives of 500 parts per million, and dissolved oxygen objectives as required by the interim water control plans.

11. Storage of water should be allowed to replace water stored in the existing Melones Reservoir which would be inundated by the enlarged reservoir.

12. Beneficial use of project water can be made for the generation of power.

27. The foregoing figures as to the amounts sought to be appropriated by the Bureau of Reclamation are taken from D 1422, pages 1 and 2. They seem at variance with the figures contained in the amended applications, copies of which are part of the record filed with the court.

28. The Board does not specifically define "consumptive purposes." Inferentially, however, it would appear to be a use that entails the permanent diversion of water from the stream bed as opposed to use for power generation where the water would be returned to the stream bed after passing through the powerhouse.

13. Preservation of the existing upstream reach of the river for white water recreation purposes conflicts with the need for increased storage for power purposes, and hence storage for power generation should be limited to the amount of storage authorized for other project purposes.

14. By dedicating the initial storage project yield to demonstrated needs for flows of water quality control and for fish and wildlife preservation and enhancement, by allowing use of only these flows for power generation, and by deferring significant impairment of upstream recreational values until a need for other uses is demonstrated, the Board's decision assures both maximum public benefit and maximum utilization of the available resources in the public interest.

The court does not recite the foregoing as a preliminary step to the traditional function of the court in reviewing the order of an administrative agency; rather, it is our purpose to measure the proceedings of the Board against the expressed or inferred objectives of Congress.

C. The Order Issued by the State Water Resources Board.

The Board, after approving the assignment to the Bureau of the applications previously filed by the Department of Finance, State of California,[29] approved Applications 14858, 14859, 19303 and 19304 in part, and specified that the permits issued pursuant thereto would be subject to certain limitations.

We again group the Board's action on the Bureau's Applications together according to the proposed uses to be made of the water.

1. Conditions contained in the Permits issued pursuant to Applications 14858 and 19304:

(a) 1–a:

"The water appropriated under the permit issued pursuant to Application 14858 shall be limited to the quantity which can be beneficially used and shall not exceed 980,000 acre-feet per annum by storage to be collected from November 1 of each year to June 30 of the succeeding year. Until further order of the State Water Resources Control Board, the water shall be used only for preservation and enhancement of fish and wildlife, recreation and water quality control purposes."

(b) 1–d:

"The water appropriated under the permit issued pursuant to Application 19304 shall be limited to the quantity which can be beneficially used and shall not exceed 1,420,000 acre-feet per annum by storage to be collected from November 1 of each year to June 30 of the succeeding year. Until further order of the State Water Resources Control Board, the water shall be used only for preservation and enhancement of fish and wildlife, recreation and water quality control purposes."

(c) 4:

"Permits issued pursuant to Applications 14858 and 19304 shall authorize the use of water for consumptive purposes only in the counties of Stanislaus, Calaveras, Tuolumne and San Joaquin. A petition to amend the permits to include other specific areas will be considered by the Board upon a showing that water from other CVP sources is not available to serve such areas. Any use of water for consumptive purposes outside the counties of Stanislaus, Calaveras, Tuolumne and San Joaquin that may be authorized later shall be subordinate to beneficial use within said counties and shall terminate when contracts are executed and the water is needed for beneficial use within said counties.[30]

"Under the agreement providing for the dismissal of the districts' protests, the Bureau will deliver all of the inflow of the New Melones Reservoir up to 654,000 acre-feet in each year for rediversion at Goodwin Dam in

---

29. *See* n. 15, *supra*.

30. The Board handled the prior water rights of the Oakdale and South San Joaquin Irrigation Districts in the following manner:

### (d) 5:

"Releases of conserved water from New Melones Reservoir for water quality control purposes shall be scheduled so as to maintain a mean monthly total dissolved solids concentration in the San Joaquin River at Vernalis of 500 parts per million or less and a dissolved oxygen concentration in the Stanislaus River as specified in the Water Quality Control Plan (Interim), San Joaquin River Basin 5C, State Water Resources Control Board, June 1971."

D 1422, pp. 29–31.

### DISCUSSION

The conditions imposed on the federal agency with regard to applications 14858 and 19304 *are not* inconsistent with the objectives of Congress when it authorized the enlarged New Melones Project, and ordered it to be included in and operated as an integral part of the Central Valley Project. Although there is must discussion in HD 453 about development of additional water for transportation to other areas served by the Central Valley Project, but outside the counties of Calaveras, San Joaquin, Stanislaus and Tuolumne,[31] there is no evidence in the record that the Bureau, at the time the Board had these applications under consideration, had signed any contracts obligating it to deliver water to such areas. While the court can confidently say that Congress intended that ultimately surplus water would be so used (and the Board recognizes this fact), nothing in the record would indicate that Congress intended such surplus water to be impounded and held behind the New Melones Reservoir until its beneficial use in such areas could be implemented by the Bureau.

Conditions 1–a and 1–d also limit the period of appropriation to November 1 of each year to June 30 of the succeeding year. This is actually consistent with the Board's findings concerning the period of the year during which unappropriated water is available; hence, it would be consistent with Congress' purposes in entrusting the Bureau with the task of securing the necessary unappropriated waters pursuant to state law in order to operate the project.

The following statement appears in D 1422, p. 18:

"In view of the preponderance of adverse consequences of maintaining a reservoir of the size proposed by the Bureau, the public interest requires that any permits issued pursuant to Applications 14858 and 19304 prohibit the impoundment of water in New Melones Reservoir for consumptive purposes until further order of the Board following a showing that the benefits that will accrue from a specific proposed use will outweigh any damage that would result to fish, wildlife, and recreation in the watershed above New Melones Dam and that the permittee has firm commitments to deliver water for such purposes."

The court accepts this statement as an undertaking by the Board to consider such future applications in light of the legislative objectives of Congress; hence, the interests of the United States are adequately protected with regard to the proposed uses of water listed in Applications 14858 and 19304.

2. Conditions Contained in the Permits Issued Pursuant to 14859 and 19303:

### (a) 1–b:

"The water appropriated under the permit issued pursuant to Application

---

satisfaction of the districts' prior rights." D 1422, p. 8.
It provided for the future need of certain upstream appropriators by stating:
"The agreements between the Bureau and Calaveras County, Calaveras County Water District and Tuolumne County Water District No. 2 provide that the Bureau will recognize the prior rights of the counties of origin to divert water from the upper basin as required

for their needs. Provision is also made for the counties to contract for a water supply from the yield of New Melones (CC Exh. 1; TCWD Exh. 1)." D 1422, p. 10.

31. One of the suggested "uses" was to be implemented by the construction of the East Side Canal. At the present writing, it appears that project has been abandoned.

14859 shall be limited to the quantity which can be beneficially used and shall not exceed 6,000 cubic feet per second by direct diversion to be diverted from January 1 to December 31 of each year and 980,000 acre-feet per annum by storage to be collected from November 1 of each year to June 30 of the succeeding year to be used for power purposes."

### (b) 1–c:

"The water appropriated under the permit issued pursuant to Application 19303 shall be limited to the quantity which can be beneficially used and shall not exceed 1,420,000 acre-feet per annum to be collected from November 1 of each year to June 30 of the succeeding year to be used for power purposes."

D 1422, p. 29.

### DISCUSSION

The power generation applications present the court with a great deal of difficulty.

First, it should be noted that Application 14859 was originally filed by the State of California Department of Finance, presumably some time prior to 1943. Congress, therefore, could reasonably conclude that the appropriate state agencies considered the Stanislaus River a potential source of electrical energy.

Second, the Board specifically found that the generation of power was a beneficial use; it determined that the need for white water recreation in an area upstream from the dam outweighed the immediate need for electrical power. In making this determination, the Board was following the mandate of the legislature contained in California Water Code Sections 1243 and 1257.[32]

We now analyze the materials available to Congress to ascertain the legislative objectives with regard to the generation of power at New Melones.

Although not fully detailed by the record before the court, the court takes judicial notice that the Central Valley Project was an integrated project that provided for electrical energy to be developed wherever possible to transport water from one watershed to another when such transfer could not take place by gravity flow.[33]

Further, HD 453 contained a comprehensive recreation development proposal by the Corps of Engineers in its original project plans [34] as part of the New Melones Project. The preservation of the portion of the river immediately upstream from the dam for white water boating was not discussed. The State of California commented in great detail upon the proposed recreational projects to be built as part of the New Melones Project.[35] Specifically, the State commented that the federal New Melones proposal contemplated the immediate acquisition of 1500 acres for initial recreational development, followed by an additional acquisition of approximately 2675 acres. The state urged the government to buy the additional 2675 acres "concurrently with the acquisition of the other project land." H.D. 453, p. *xxi.* After a detailed analysis, Mr. Harry Anderson, Deputy Director, Department of Fish and Game, generally concluded that, "The Department investigated this project jointly with personnel of the Office of River Basin Studies, Fish and Wildlife Service, and in general concurs with their evaluation regarding benefits to improved anadromous and warm water fisheries. Our recommendations parallel those of the Fish and Wildlife Service." H.D. 453, p. *xxv.* Anderson's comments contain several pages of specific detailed recommendations which appear to be consistent with the above general approval.

The state report which was submitted under a cover letter dated April 20, 1962, does not indicate that California desired to save that portion of the Stanislaus River lying immediately upstream from the dam for white water boating. Neither does the

---

**32.** *See* n. 14, *supra.*

**33.** See H.D. 453, pp. 29, 39 and 49.

**34.** See H.D. 453, pp. 57 and 58.

**35.** See H.D. 453, p. *xx.*

state report contain any indication that would signal Congress that California was going to deny the appropriation of a certain amount of the Stanislaus River flow for that purpose. Although not treated by the Board as an appropriation, the reservation of water for this specific use is in fact an appropriation, for it denies other potential users the right to use of such water. In effect, the Board decrees that the water will flow unimpeded through the New Melones Reservoir and will not be impounded.

If this information had been available to Congress, then consistent with its options enumerated by Justice Rehnquist in *California v. United States, supra,* Congress could have determined to incorporate that into its planning and to authorize a smaller reservoir which would accommodate California's purposes. Alternatively, Congress could have decided to abandon the project entirely! Since California did not mention this desire, the court can only deduce that Congress concluded that California and its appropriate agencies had no more beneficial use for the water than those uses proposed by the federal government in H.D. 453, including power generation.

In addition, we point to the language of the Act itself. Congress specifically mentioned the power potential of the New Melones Project in Public Law 87–874.[36] The court can only conclude that by altering the traditional priorities contained in the federal reclamation laws to favor preference customers situated in Tuolumne and Calaveras Counties who might be willing to enter into binding contracts for electrical energy, Congress intended a steady and dependable year-round supply of power to be available to fulfill such contracts. Certainly Congress did not contemplate that such "preference" customers would buy power from the Bureau of Reclamation for a few hours of the day, or during certain months of the year.

The court notes that the treatment of the power component of the New Melones Project by the Board was different from their treatment of the component relating to consumptive uses. In the consumptive use segment of the decision, the Board, in effect, said to the Bureau, "Show us your contracts and your ability to deliver the water and it may be available to you."

With respect to the power component, the Board ties the use of power production at New Melones to the need for such production in transporting New Melones water for consumptive uses out of the basin of origin. Only then should increased power production at New Melones be considered. The Board specifically rejected the use of New Melones power for general use in the Northern California power pool:

"The Bureau calculates the annual benefits of the power function of the proposed project to be over five and one-half million dollars. Restriction of storage for power purposes to the amount required for satisfaction of prior rights and flood control plus the amount allowed for fish and wildlife and water quality control would reduce the capacity of the powerplant from 300 megawatts, with an annual electrical energy production of 430,000 megawatt-hours, to some lesser but undetermined production. The opportunity to contribute to the solution of the present power supply problems should not be overlooked. However, the project was not proposed as a means of alleviating the power shortage and the Bureau did not offer evidence to show that full approval of its power applications would decrease the need for development of other sources of power." D 1422, p. 22.

Instead of requiring that the Bureau present binding contracts for the sale of New Melones power as a condition precedent to the issuance of a permit to appropriate water for the generation of electrical energy,[37] the Board assumed authority that

---

36. See detailed discussion, pp. 875, 876, *supra.*

37. In the court's view, the Board could have so limited the Bureau with regard to the appropri-

ation of water for power purposes; however, the indefinite denial of its right to generate power flies directly in the face of the congressional objective to rely upon power production

possibly was never granted to it,[38] and which, if it had existed, California had seemingly assured Congress would not be used!

In subsequent documents filed with the court, and in various oral arguments before the court, attorneys for the Board have consistently invited the Bureau to file new applications to let the Board once again review the power component of the New Melones Project.

The Bureau has consistently refused to make such a gesture, reiterating its basic stand that the conditions imposed upon its operation of the New Melones Project are invalid.

▮ Such intransigent attitudes well deserve the imprecation of "a plague on both your houses." The Board has ample authority under the power allotted to it by the legislature to reconsider, *sua sponte*, any appropriation permit; indeed, it makes reference to such authority in condition 13 of its order.

To the extent that there is unappropriated water available,[39] any limitation of the amount of water which the United States might appropriate for the generation of electrical energy up to and including 2,400,-000 afa is inconsistent with the congressional objective that New Melones be constructed and operated as a multi-purpose reclamation project. Further, the State conditions, if enforced, would deny the United States a very important source of revenue which it had intended to use for the repayment of the very substantial costs of this project.

The court notes that both California and the United States operate statewide water systems employing the San Joaquin-Sacramento River Delta area as a transfer point to move water produced in both those river systems to the Central Valley and Southern California. Both the feasibility of those projects and the survival of the ecological system of the Delta lands and water are dependent upon water quality in the Delta.

The Stanislaus River contributes approximately 25 percent of the total inflow into the San Joaquin River. In order to make these massive projects work successfully, each party must be fully informed as to what water is being impounded, where, and hence, what adjustments must be made to maintain the aforementioned water quality in the Delta.

In reviewing the conditions imposed by D 1422, other than the conditions placed on appropriations, the court has tried to read such conditions in light of the foregoing problems.

## XI

## ORDER

▮ A. Conditions 1–a and 1–d do not offend congressional objectives pertaining to the impoundment of water behind New Melones Dam for irrigation, domestic and industrial use, fish and wildlife preservation and propagation, and water quality control, and hence are binding upon the United States and its agencies.

▮ B. Conditions 1–b and 1–c do offend congressional objectives pertaining to the impoundment of water behind New Melones Dam for the generation of electrical energy. Any limitation placed upon the federal agencies which would prevent it from diverting up to 2,400,000 afa of unappropriated water when available is not binding upon or enforceable against the United States or its agencies.

---

as a means of amortizing the cost of the dam and the accompanying works.

**38.** The Board departed significantly from its prior practice in this specific instance. *See* p. 877, supra.

**39.** The court does not construe the Board's general finding that there is sufficient unappro-

priated water (*supra*, p. 882) to operate the New Melones Project as proposed by Congress to be a commitment that such amounts of water will be available every year. The prospective deficiencies in water supplies presently facing parts of California are typical of the cyclical weather conditions experienced in California.

In view of the passage of time since D 1422 was announced, it may be necessary for the Board to determine the precise amount of unappropriated water available in the Stanislaus watershed from time to time.

■ C. Conditions 2 and 3 are invalid to the extent they purport to limit the amount of unappropriated water which the federal agencies may impound for power generation purposes, and any enforcement of these conditions must be modified to conform with the court's Order in Paragraph B of Part X, *supra*.

■ D. Conditions 4, 5, 6 and 7 are consistent with congressional objectives, and are binding on, and enforceable against the United States and its agencies.

E. Condition 8(a) is consistent with congressional intent; hence, it is binding and enforceable against the United States and its agencies. Conditions 8(b) and 8(c) are not consistent with congressional intent, and hence are not binding upon the United States and its agencies.

Nothing contained in this paragraph, however, shall prevent the federal agencies from voluntarily assuming these burdens.

■ F. Condition 9 is not consistent with the objectives of Congress insofar as the Board's power to reduce the maximum quantities of water is not tied to the unavailability of unappropriated water.

G. Conditions 10 and 12 are moot.

H. Conditions 11, 13, 14, 15, 16, 18, 19, 20, 21, 22, 23, 24 and 25 are consistent with congressional intent and hence are binding upon the United States and its agencies.

■ I. Condition 17 addresses a construction feature of the dam itself. Congress clearly intended the Army Corps of Engineers to build the dam according to the Corps plans and specifications. This condi-

tion, if not mooted by prior compliance during the actual construction of the dam, is not binding upon the United States or its agencies.

STATE OF CALIFORNIA
STATE WATER RESOURCES CONTROL BOARD

In the Matter of Applications 14858, )
14859, 19303 and 19304 to Appro- )
priate from Stanislaus River in )
Calaveras and Tuolumne Counties. )   Decision 1422
)
U. S. BUREAU OF RECLAMATION,)
Petitioner and Applicant )
_____)

DECISION GRANTING PETITION FOR ASSIGNMENT OF APPLICATIONS AND APPROVING APPLICATIONS IN PART.

BY THE BOARD:

U. S. Bureau of Reclamation, hereinafter referred to as "Bureau" having filed a petition for assignment of Applications 14858 * and 14859 and having filed Applications 19303 and 19304 for permits to appropriate unappropriated water; protests having been received; a public hearing having been held before the State Water Resources Control Board commencing on October 26, 1972; applicant, protestants and other persons having appeared and presented evidence; the evidence received at the hearing having been duly considered, the Board finds as follows:

*Substance of the Applications*

1. (a) Application 14858 is for a permit to appropriate 8,800 cubic feet per second (cfs) by direct diversion, year-round, and 980,000 acre-feet per annum (afa) by storage to be collected from October 1 of each year to July 1 of the succeeding year for irrigation, domestic, municipal, industrial, fish culture, recreation and water quality purposes from the Stanislaus River in Calaveras and Tuolumne Counties.

* Applications 14858 and 14859 were originally filed by the Department of Finance pursuant to Water Code Section 10500 and were subsequently transferred to the State Water Resources Control Board pursuant to Water Code Section 10504. The Bureau has filed a petition for assignment of these applications which petition includes proposed completed applications in its name as required by Water Code Section 10504 and board rule (California Administrative Code, Title 23, Section 800).

(b) The foregoing information is identical in Application 14859 except that its purpose of use is power generation.

(c) Application 19303 is for a permit to appropriate 6,000 cfs by direct diversion and 2,400,000 afa by storage, both year-round, for power generation from Stanislaus River in Calaveras and Tuolumne Counties.

(d) Application 19304 is for a permit to appropriate 2,250 cfs by direct diversion and 2,400,000 afa by storage, both year-round, for irrigation, domestic, municipal, industrial, fish culture, recreation and water quality control purposes from the Stanislaus River in Calaveras and Tuolumne Counties.

The primary point of diversion under all four applications is at the proposed New Melones Dam which will be located within the SW¼ of SW¼ of Section 11, T1N, R13E, MDB&M, on the Calaveras County-Tuolumne County boundary line. A proposed Knights Ferry diversion dam which will be located downstream from New Melones Dam within the SW¼ of NE¼ of Section 21, T1S, R12E, MDB&M is also listed as a point of direct diversion under Applications 14858 and 19304.

*Applicant's Project*

2. The U. S. Corps of Engineers has under construction a multipurpose project, known as New Melones, on the Stanislaus River approximately 35 miles northeast of the City of Modesto. The principal feature of the project will be a dam to be constructed approximately three-quarters of a mile downstream from the present Melones Dam and reservoir which has a capacity of 112,-000 acre-feet. The new reservoir will have a capacity of 2,400,000 acre-feet and will inundate the existing dam and reservoir. The New Melones project will be operated and maintained by the Bureau and it will be an integrated part of the Central Valley Project (CVP).

The proposed place of use for water conserved by the project, as amended by petition submitted November 16, 1972, includes all of Calaveras, Tuolumne, Stanislaus, San Joaquin and Contra Costa Counties along with the remainder of the CVP service area in San Joaquin and Santa Clara Valleys.

The portions of this area which will actually be served with water have not been more specifically identified. The Bureau's economic analysis of the project assumes that some water will be used in the Kaweah River area within the San Joaquin Valley (Staff Exh. 12, p. 8). This would require the construction of conveyance facilities that have not as yet been authorized by Congress. The act of Congress authorizing the project requires that the Stanislaus River basin be given preference in the use of project water.

The project will provide flood protection to approximately 35,000 acres of highly developed agricultural land in the flood plain of the Stanislaus River and to the suburban areas of Ripon, Oakdale and Riverbank. In conjunction with other works it will provide flood protection to agricultural lands along the San Joaquin River and to agricultural lands within the Sacramento-San Joaquin Delta and to suburban areas south of the City of Stockton (RT 25).

The project also will provide water for water quality control and fish and wildlife preservation and enhancement along the Stanislaus River, lower San Joaquin River and possibly provide additional water for water quality control in the Delta (RT 27). Under the terms of an agreement with the California Regional Water Quality Control Board, Central Valley Region, the Bureau has agreed to release up to 70,000 acre-feet of the annual conservation yield of the reservoir to meet water quality objectives.

The project will have power facilities installed immediately below the dam which will consist of two 150 megawatt generators.

*Protests to Applications*

3. Protests to the applications were filed by numerous individuals, companies, reclamation districts, irrigation districts and other public agencies. Most of the protestants now have no objection to the project and some of the original protestants actually support it. Their principal concern is in the manner in which the project will be operated, particularly in respect to protection of

downstream rights, meeting water quality objectives, location of the areas to be served by the project and the purposes for which the water will be used.

Protestants Oakdale and South San Joaquin Irrigation Districts, Tuolumne County Water District No. 2 and Calaveras County Water District have withdrawn their protests to the applications following agreement with the Bureau (USBR Exh. 37; TCWD No. 2 Exh. 1). Any permits issued pursuant to subject applications should be made subject to these agreements.

Protestants Contra Costa County Water Agency, et al. in their brief persist in the position taken during the hearing that Board action on the subject applications should be held in abeyance until the Bureau agrees to abide by any permit terms that may be contained in any permits issued pursuant to the applications. A motion to this effect made during the hearing was properly denied.

Protestants Delta Water Agency, Delta Water Users Association, San Joaquin County Flood Control and Water Conservation District, Banta Carbona Irrigation District, Stanislaus River Flood Control Association, Stockton-East Water District and McMullin Reclamation District, et al. support the New Melones Project and are in substantial agreement as to special terms to be included in any permits that may be issued. Requested special permit terms are: a term limiting the entire yield of the project to use in Calaveras, Tuolumne, Stanislaus and San Joaquin Counties; terms imposing more stringent standards for the protection of water quality in the lower San Joaquin River and Delta for an interim period, the Board retaining jurisdiction in the matter; a term retaining jurisdiction by the Board over fishery flows; a term retaining jurisdiction by the Board in respect to points of rediversion; and a term subjecting the permits to vested rights (a standard permit term). Also requested to be included is a term that would insure that landowners downstream from the dam will receive the flood control benefits for which the project was authorized and a term re-

quiring the Bureau to promptly negotiate with users of water from the Stanislaus River concerning protection of their existing water rights, with the Board reserving jurisdiction over any permits until it does so; however, these are matters not within the Board's authority. Any permits issued will be subject to all prior rights and will not authorize any interference with such rights.

Protestant Department of Fish and Game has recommended greater releases of water for fishlife than those proposed by the Bureau. It also recommends the acquisition of the remaining riparian habitat along the lower portion of the Stanislaus River for the protection of wildlife; that steps be taken to mitigate destruction of wildlife within the reservoir area; and that the Board retain continuing jurisdiction in the matter of fish releases until further information is obtained (F & G Brief, p. 6).

Protestant Environmental Defense Fund contends the Bureau has failed to justify a project of the magnitude planned and has failed to show that the water will be placed to beneficial use within a reasonable time. It recommends that the applications and petition for assignment of State filings be denied, particularly in view of the adverse effect the project will have on the environment of the area and on whitewater boating.

Protestant Sierra Club contends that there is no water available from the Stanislaus River and lower San Joaquin River for the out-of-basin uses as contemplated by the Bureau, and that the Bureau is not in a position to place the water covered by the permits to beneficial use within a reasonable period of time. It also recommends that the applications and petition for assignment of State filings be denied.

*Water Supply*

4. The watershed of the Stanislaus River above the proposed New Melones Dam varies in elevation from 1,088 feet to over 10,000 feet at the crest of the Sierra Nevada. The total drainage area is approximately 900 square miles. The annual rainfall averages approximately 27 inches at the

damsite and 65 inches in the upper portion of the watershed.

The estimated unimpaired annual flow in the Stanislaus River at Melones Dam has been as low as 261,000 acre-feet and as high as 2,356,900 acre-feet (USBR Exh. 27). The average annual unimpaired flow is approximately 1,100,000 acre-feet (Staff Exh. 12, p. 34).

Oakdale and South San Joaquin Irrigation Districts divert most of the flow of the Stanislaus River other than flood flows into their main canals at Goodwin Dam approximately 12 miles downstream from New Melones. As a result, the river is frequently dry immediately below Goodwin Dam during the summer months.

*Water Requirements of Users Holding Prior Rights*

5. Oakdale and South San Joaquin Irrigation Districts are the major holders of prior rights to the water from Stanislaus River. They constructed the present Melones Reservoir approximately 45 years ago and in 1957 they completed Tulloch, Donnells and Beardsley Reservoirs known as the Tri-Dam Project. Donnells and Beardsley Reservoirs are on the upper middle fork of the Stanislaus River and Tulloch Reservoir is located on the main stem of the river several miles below Melones Reservoir. The total capacity of the three reservoirs is 230,400 acre-feet. During the period of 1914–1970 the districts' diversions of water from the Stanislaus River under all claims of right have varied from approximately 204,000 acre-feet in 1924 to a high of 597,300 acre-feet in 1962 with an average annual diversion of 409,500 acre-feet. Under the agreement providing for the dismissal of the districts' protests, the Bureau will deliver all of the inflow of the New Melones Reservoir up to 654,000 acre-feet in each year for rediversion at Goodwin Dam in satisfaction of the districts' prior rights.

The ultimate annual demand for Stanislaus River water below Goodwin Dam has been calculated to be 74,500 acre-feet under active and dormant riparian rights, appropriative rights including all applications on file with the Board as of the year 1972, and approximately 9,000 afa for undefined "other rights" (USBR Exhs. 33, 34). All of these uses are by direct diversion with a season that generally extends from March through October (USBR Exh. 19). The Bureau's proposed project could not harm these users during the July through October period as no water is available for the project during that period. Accretions to the river between Goodwin Dam and its mouth will be sufficient to cover rights in that area during the March through June period. A comparison of the records of a gaging station just below Goodwin Dam with a station near the mouth of the river for the months of March through June during the period 1963–1968 indicates an average accretion of 47,440 af (USBR Exhs. 12 and 15). The estimated average ultimate annual requirements of the downstream users during March through June is 35,118 acre-feet. (USBR Exh. 34).

The Stanislaus River watershed upstream from the site of the New Melones Dam includes portions of Alpine, Tuolumne and Calaveras Counties. Use of water from the Stanislaus River in Alpine County is mostly on U. S. Forest Service land and the anticipated demand for water in the county is included in a 2,000 afa allocation by the Bureau for use in the Stanislaus National Forest. Calaveras County Water District holds numerous permits to appropriate water for the development of the Stanislaus River basin. Tuolumne County Water District No. 2 also has undeveloped rights to water in the upper Stanislaus basin. The Bureau has estimated the actual yield of the upstream rights of both counties to be 312,000 afa by storage and 1,739 cfs by direct diversion (USBR Exh. 31; RT 64). The agreements between the Bureau and Calaveras County, Calaveras County Water District and Tuolumne County Water District No. 2 provide that the Bureau will recognize the prior rights of the counties of origin to divert water from the upper basin as required for their needs. Provision is also made for the counties to contract for a water supply from the yield of New Melones (CC Exh. 1; TCWD Exh. 1).

*Availability of Unappropriated Water*

6. The Bureau's conclusion as to the extent that water in the Stanislaus River remains unappropriated is based upon its estimate of the unimpaired inflow to the New Melones site for a hydrologic cycle equivalent to the period 1923 through 1953. After deducting the quantity of water necessary for the above-described demands the annual average surplus is an estimated 335,000 acre-feet and varies from zero which occurs in nine years of the period of study to 1,980,000 acre-feet.

The Bureau's Exhibit 32a shows no unappropriated water during the month of October and that month should be eliminated from the diversion season specified in any permits to be issued. Diversion during the months of July through September is precluded by past decisions of the Board, and should also be excluded from the permits.

Unappropriated water is available to supply the Bureau, and, subject to suitable conditions, such water may be diverted and used in the manner proposed without causing any substantial injury to any lawful user of water.

*Water Quality*

7. The Stanislaus River contributes approximately 25 percent of the annual flow of the San Joaquin River as measured at the USGS gaging station "at Vernalis" and approximately 15 percent of the July through October flow (USBR Exh. 45). The gaging station is just below the confluence of the two rivers. Most of the summer flow in the lower San Joaquin River consists of irrigation return water. The total dissolved solids (TDS) exceed 500 parts per million (ppm) approximately 38 percent of the time during the irrigation season (USBR Exh. 42; RT 235). The Stanislaus River is an important source of dilution water required to reduce the TDS in the lower San Joaquin River to usable levels (Staff Exh. 11, pp. 13, 15, 27).

The Bureau under its agreement with the California Regional Water Quality Control Board, Central Valley Region, plans to release up to 70,000 acre-feet of water in any one year as required to maintain a mean monthly TDS concentration in the San Joaquin River below the mouth of the Stanislaus River at 500 ppm maximum, also to maintain at least five ppm of dissolved oxygen (DO) in the Stanislaus River (Staff Exh. 13). The Bureau estimates that the DO requirement can be met in 10 out of 11 years, assuming a 1975 level of development, with a water quality release averaging 15,520 afa. These releases will be in addition to the Bureau's planned fish releases which amount to 98,000 acre-feet in a normal year. Releases required to meet these water quality objectives would not exceed 70,000 acre-feet maximum until about year 2075 according to a report written by the U.S. Public Health Service (Staff Exh. 11, Table A–4, p. A–12).

However, the ability of the agreed-upon releases to accomplish the water quality objectives depends upon the assumption that the mean TDS concentration of water released from New Melones will be 50 ppm and that the relationship between flows and TDS at Vernalis established by the U. S. Public Health Service (Staff Exh. 11) will continue. These assumptions may not be valid. TDS levels up to 175 ppm have been recorded prior to the construction of the Tri-Dam Project. Also, evaporation at New Melones Reservoir and return flows from future developments upstream could increase salt levels. Only meager data has been presented by the Bureau concerning the flow versus TDS concentrations in the earlier years. There is little basis for concluding that the flow versus TDS relationship at Vernalis is stable on a long-term basis. Also, a problem in predicting the effect of releases of project water on water quality is the failure of the Bureau to specifically designate the place and method of using the conservation yield of the project.

There was considerable evidence presented at the hearing as to what are proper water quality objectives. The Department of Fish and Game has requested a minimum DO of 7 ppm to protect the salmon fishery (RT 526). The Board's Interim Water Quality Control Plan, San Joaquin Basin 5C, specifies that as a result of waste discharg-

es the DO in the Stanislaus River should not fall below 85 percent of the saturation value, which is more restrictive than the DO standard of 5 ppm agreed upon by the Bureau. Protestants Delta Water Agency and Banta-Carbona Irrigation District recommend that the maximum total dissolved solids at Vernalis be 450 ppm at a 14-day running average (RT 911). If these objectives had been met during the years 1950 through 1969 the Bureau's proposed limit of 70,000 afa would have been exceeded in ten out of the twenty years. (DWA Exh. 24).

In view of the uncertainty inherent in the problem of proper releases to protect water quality, any permits issued pursuant to subject applications should contain an interim term until further studies are made requiring releases of conserved water from New Melones which will maintain a mean monthly TDS concentration in the San Joaquin River at Vernalis of 500 ppm or less and a DO concentration in the Stanislaus River as specified in the Interim Water Quality Control Plan. The Board should reserve jurisdiction over the permits for the purpose of revising water release requirements for water quality objectives.

*Consumptive Use of Project Water*

8. The Bureau has described the following areas within which the conservation yield of the New Melones Project may be used for irrigation or other consumptive purposes; the local service area consisting of Tuolumne, Calaveras, San Joaquin and Stanislaus Counties; southern San Joaquin Valley via the proposed East Side Canal or a Cross Valley Canal; San Felipe division of the CVP; San Luis unit of the CVP; the area served by the Delta Mendota Canal; the Montezuma Hills Unit of the CVP; and the Suisun Marsh area.

The entire service area which the Bureau has designated as the place of use includes over 11,000,000 acres of land.

There is a future need for additional water supplies in one or more of the above areas. However, the Bureau has presented no specific plan for applying project water to beneficial use for consumptive purposes at any particular location. Furthermore,

the record shows that the CVP has substantial quantities of water that are not being used and are not under contract. The Bureau's own records indicate that without the yield of the New Melones Reservoir the Bureau can meet the estimated buildup of demands under present contracts for a long period of years (USBR Exh. 46 with supplements).

While the Bureau may not be "up to its ears in water" as suggested by Protestant Environmental Defense Fund (EDF Brief, p. 5), there certainly has been no demonstrated need for the additional water supplies developed by this project, outside of the local area. Two aspects of this part of the Bureau's case as to the need for water are disturbing; although this decision is in no way dependent upon the information in question, our concerns will be mentioned.

The effort of the Bureau to obfuscate the effect on the applicant of this Board's Decision 1379 is one of them. The Bureau has stated that its share of the additional Delta outflow required to meet the requirements of Decision 1379 would be 2.2 million afa (RT 186). It has also stated that this amount would be reduced to 1.6 million afa with the Peripheral Canal only, and 1.1 million afa with both the Peripheral Canal and Delta Overland Facilities (USBR Exh. 46). It is our understanding that export of water from the Delta during minimum flow periods in the full amount contemplated by the State and Federal Projects cannot be accomplished without the Peripheral Canal or equivalent facilities (DWR Exh. 502; Staff Exh. 502B, Delta Hearing). Therefore, the significance of the oft-mentioned 2.2 million afa is not apparent.

We are also concerned that the increase in uncommitted yield of the CVP, due to less than expected demand of Sacramento River users, was disclosed more or less as extraneous information, rather than as an integral part of the planning data (RT 745 et seq.).

By failing to present evidence of a specific plan to use the water conserved by the New Melones Project for consumptive pur-

poses, the Bureau has failed in spirit if not in substance to meet the statutory requirements for approval of a permit to appropriate water for such purposes. While this Board, in the past, has consistently recognized the need to operate facilities of the Central Valley Project in an integrated manner (see Decisions 893, 990, 1356), the law requires the Board to examine each application and determine that the water to be appropriated will be placed to beneficial use (Water Code Sec. 1240). In addition, the specific intended use must be evaluated and found to be reasonable, beneficial and *in the public interest* before a permit can issue. The Board undertakes a balancing of competing demands and policy considerations and has broad discretion (Water Code Sec. 1257, *Temescal Water Co. v. Dept. of Public Works*, 44 Cal.2d 90, 280 P.2d 1).

The record contains substantial evidence that the full conservation yield of the New Melones Project, and more, will eventually be needed in Tuolumne, Calaveras, San Joaquin and Stanislaus Counties (RT 145–147, 1131). These four counties include substantial areas in the Stanislaus River basin and are considered by the Bureau to be entitled to preference in the use of project water, based on the provisions of Public Law 87–874 and the California County of Origin Law (Water Code Sec. 10505) (RT 144). The Board agrees, as explained later in this decision.

The limited unappropriated water resource of the State should not be committed to an applicant in the absence of a showing of his actual need for the water within a reasonable time in the future. When the evidence indicates, as it does here, that an applicant already has a right to sufficient water to meet his needs for beneficial use within the foreseeable future, rights to additional water should be withheld and that water should be reserved for other beneficial uses. In this case, existing surplus supplies that are available to the Bureau should be utilized before storage is allowed in New Melones Reservoir to satisfy demand for more water in service areas outside of the four basin counties.

Although the full conservation yield of the project will be required for future development of the four basin counties, no facilities have been planned up to now to serve project water in these counties and no contracts have been negotiated for such service. The record is not clear how soon water user agencies will be ready to execute any such contracts.

The lack of evidence that New Melones Project water will be needed for consumptive use outside the four basin counties for many years to come, if ever, or that it will be used within those counties at any definite time in the future, raises substantial doubt whether permits should be issued to impound more water in New Melones Reservoir, at least at this time, than is needed for satisfaction of prior rights and nonconsumptive purposes—protection and enhancement of fish and wildlife, water quality, recreation and generation of power.*

To help resolve this doubt the Board must consider any adverse consequences of such impoundment. The proposed reservoir would inundate approximately 13 miles of river upstream from the existing Melones Reservoir, including approximately 9 miles above Parrotts Ferry Bridge now being used for whitewater recreation. Any storage of water above the levels of the existing Melones Reservoir will conflict with use of the upper reach for whitewater boating, stream fishing, and other stream-related activities.

Protestant Environmental Defense Fund estimates that in the year 1971 use of the river for whitewater recreation amounted to over 23,000 visitor days and that such use may eventually increase to 90,000 visitor days per year (EDF Exh. 1; RT 1059). It has been estimated that visitors using the services of commercial river runners spent approximately $730,500 in 1971. The project's recreational features would not adequately substitute for the present recreational uses of the river in the upstream reach. A study by the Water Resources

* Permits to impound water for flood control are not required and were not requested.

Council indicates that the New Melones site does not lie within one of the regions which will require additional reservoir recreation areas by the year 2020 (EDF Exh. 7). There are numerous other reservoirs already in the same region (EDF Exh. 6); further, a lake fishery is not adequate replacement for a stream fishery, insofar as many users are concerned. While stream fishing downstream from the reservoir would be enhanced, it would be practically eliminated in the area to be inundated, together with other stream-related activities and wildlife habitat. Although there would still be opportunity for stream-related activities above Camp Nine, that area is less accessible and would not readily absorb users displaced from the lower reach.

In view of the preponderance of the adverse consequences of maintaining a reservoir of the size proposed by the Bureau, the public interest requires that any permits issued pursuant to Applications 14858 and 19304 prohibit the impoundment of water in New Melones Reservoir for consumptive purposes until further order of the Board following a showing that the benefits that will accrue from a specific proposed use will outweigh any damage that would result to fish, wildlife and recreation in the watershed above New Melones Dam and that the permittee has firm commitments to deliver water for such purposes.

Because of the lack of a showing of need for water from the New Melones Project outside the counties of Calaveras, Tuolumne, Stanislaus and San Joaquin, the permits should restrict the place of use of water for consumptive purposes to those counties, but should provide that a petition to include other specific areas will be considered by the Board upon a showing that water from other CVP sources is not available to serve such areas. The permits should further provide that any use of water for consumptive purposes outside the four basin counties shall be subordinate to beneficial use within said counties and shall terminate when contracts are executed and the water is needed within said counties. Such a provision is necessary to conform to the preference given to use within the Stanislaus

River Basin by the authorizing act of Congress (P.L. 87–874), and a similar preference given to the counties of origin and to the watershed of origin and areas immediately adjacent thereto by state law (see Water Code Secs. 10505 and 11460).

Even without storage of water for consumptive use, a substantial part of the 9-mile reach of river channel above Parrotts Ferry Bridge will be inundated at times. A reservoir of 1,100,000 acre-feet, the approximate size estimated to be required to provide for prior rights, flood control, and for water for the previously discussed non-consumptive uses, would inundate all but the upper few miles of this reach. However, 450,000 acre-feet of the 1,100,000 acre-feet is required for flood control. There would be parts of all years, and some entire years, when the flood space would be empty. With the flood space empty, only about 2½ miles of the nine-mile reach would be inundated. Further drawdown into the conservation storage range, which would be the usual summer occurrence, would make even more of the whitewater reach available.

It is apparent that intermittent inundation of the whitewater reach would degrade the appearance of the stream to some extent. However, it should not be necessary to maintain high water levels for long periods. The canyon is steep sided and extensive mud flats should not form. On the whole, degradation of the esthetic values is expected to be minimal.

*Releases of Project Water for Preservation and Enhancement of Fishlife*

9. Applications 14858 and 19304 list "fish culture" as a purpose. The Bureau proposes to release water from New Melones Reservoir for the preservation and enhancement of fishlife, rather than actually engaging in the raising of fish, and the permits should be issued accordingly.

The value of the Stanislaus River as a salmon fishery resource has been estimated to be $300,000 per year (RT 52).

Revised Department of Fish and Game recommendations now call for releases of 262,000 afa from New Melones Reservoir

for preservation and enhancement of the fishery in the Stanislaus River and an additional 50,000 afa for the same purposes in the Delta in a normal year. The drastic revision upward is due, in part, to a belief on the part of the Department that it is the ability of the spring flows to flush juvenile salmon to the ocean which determines the success of the spawning run two and one-half years later when the same salmon return to the river.

There are a number of factors besides flows which affect the salmon run in the Stanislaus River. Further study of the matter is needed, which should include such factors as the feasibility of providing a fish hatchery instead of large river flows.

Any permits issued pursuant to Applications 14858 and 19304 should contain terms requiring the release of up to 98,000 afa for maintenance of fish and wildlife as planned by the Bureau to be released at a rate and during periods specified by the Department of Fish and Game. Jurisdiction should be reserved by the Board to later revise the releases for preservation and enhancement of fish and wildlife upon reviewing the results of further studies, as mentioned above. Such studies were proposed by the Bureau and agreed to by the Department of Fish and Game. The joint investigation should include an attempt to determine the optimum balance between maximizing fish and wildlife benefits while minimizing reservoir storage levels, during the period prior to storage of water for consumptive uses.

*Dry Year Criteria*

10. Formal dry year criteria for the benefit of consumptive uses will not be specified at this time since the Board is making no allocation of water for irrigation, domestic, municipal and industrial uses. However, the Board will reserve jurisdiction until the conservation yield is fully allocated to provide such dry year criteria as appear warranted after further hearing.

*Hydroelectric Power Development*

11. Inasmuch as there is considerable question as to the need for appropriation of water in the proposed quantities for purposes other than the generation of power, it is necessary to determine if the project's power benefit alone justifies storage in addition to that presently needed for other purposes.

Previous mention has been made of the fact that any increase in storage conflicts with use of the upper river for whitewater recreation, stream fishing and wildlife. If as the demand for water for consumptive uses increases and storage for those uses is authorized, storage for power purposes will also be considered. The immediate question, therefore, is whether the need for maintaining the present regimen of the stream outweighs the need for an additional increment of generating capacity during the interim period.

The Bureau calculates the annual benefits of the power function of the proposed project to be over five and one-half million dollars. Restriction of storage for power purposes to the amount required for satisfaction of prior rights and flood control plus the amount allowed for fish and wildlife and water quality control would reduce the capacity of the powerplant from 300 megawatts, with an annual electrical energy production of 430,000 megawatt-hours, to some lesser but undetermined production. The opportunity to contribute to the solution of the present power supply problems should not be overlooked. However, the project was not proposed as a means of alleviating the power shortage and the Bureau did not offer evidence to show that full approval of its power applications would decrease the need for development of other sources of power.

Although maintenance of the upstream reach of the river in its present state solely for recreational uses cannot be justified strictly on an economic basis. The recreational uses in question have a value beyond that described by dollar resources only.

Opportunities for lake fishing are relatively abundant in California and stream fishing does not appear to be critically lacking. However, the tendency of increased levels of development is to replace stream fisheries with lakes. Therefore, when a

choice must be made between two alternates which will result in different types of fisheries, extra weight should be attached to the value of a stream fishery.

The situation with respect to whitewater boating is analogous to that of the fisheries. While the opportunities for flat water boating are abundant, streams suitable for whitewater boating are extremely scarce (RT 1061); also, the Stanislaus may be the second most heavily used river in the nation for that purpose in actual number of visitors per year (RT 1062). In fact, the Bureau has contended that overuse of the river may become a problem.

If the Bureau eventually substantiates the need for storage for consumptive use purposes out-of-basin (such as in the San Luis service area), large quantities of power will be required to deliver the water. At such time, development of the full power potential of New Melones should be considered to offset the increased pumping demand insofar as possible. In the meantime, any power developed at New Melones in excess of the losses in production expected at the existing Melones and Tulloch Powerhouses will be a net gain to the pool of available power. If substantial basin exports are allowed in the future, the balance may shift to a net loss, even with increased production at New Melones.

In view of the foregoing, the Board finds that the reach of river in question is a unique asset to the state and the nation. Until the need for water for consumptive purposes dictates approval of increased storage, the public interest requires that storage for power purposes also be kept at reduced levels. Permits issued pursuant to Applications 14859 and 19303 for power purposes should be limited to the amount of conservation storage authorized under the permits issued pursuant to Applications 14858 and 19304. Direct diversion under Applications 14859 and 19303 for power purposes should be limited to 6,000 cfs which will be the capacity of the proposed penstocks.

*Assignment of State Applications 14858 and 14859 Held by the Board*

12. The Board may assign any applications filed in accordance with Water Code Section 10500 and held by the Board when the assignment is for the purpose of development not in conflict with a general or coordinated plan looking toward the development, utilization, or conservation of the water resources of the State or with water quality objectives established pursuant to law (Water Code Sec. 10504). Further, no such assignment shall be made that will deprive the county in which the water covered by the application originates of any such water necessary for the development of the county (Water Code Sec. 10505).

The Bureau's project is not in conflict with any such general plan looking toward the development, utilization or conservation of the water resources of the State or with water quality objectives. The California Water Plan provides for the enlargement of existing Melones Reservoir to the capacity of 1,100,000 acre-feet (DWR Bulletin 3, p. 130). The use of a portion of the conservation yield of New Melones Reservoir for water quality control is in keeping with water quality objectives for the lower San Joaquin River. Assignment of the applications should be subject, in conformity with Section 10505 of the Water Code, to any and all rights of any county in which the water sought to be appropriated originates to the extent that any such water may be necessary for the development of such county. As so conditioned, the assignment will not deprive any such county of any water necessary for its development. Any permits issued pursuant to the applications should contain a similar term.

The counties of origin are further protected by Public Law 87–874. It provides that the needs of the Stanislaus River basin have priority in allocating project water.

*The Board's Jurisdiction*

13. The regional solicitor, who is the Bureau's legal representative in this proceeding, reiterates the official position that has been advanced by him in previous proceedings before this Board, that we have no

jurisdiction to impose any conditions or limitations upon the Bureau's permits. He argues that the Board's function is "ministerial"; that having determined that unappropriated water exists, a permit for the unappropriated water then follows "as a matter of course" (USBR Opening Brief, p. 10).

Such an interpretation of the Board's authority is not supported by either statutory or case law and is not even consistent with other portions of the solicitor's brief or with the Bureau's conduct with respect to previous applications that have been acted upon by the Board and its predecessors. The solicitor himself proposes a special permit term requiring the Bureau to conduct certain studies related to the fishery in the Stanislaus River (USBR Opening Brief, p. 3).

Rather than an extended legal discussion at this time we feel it is sufficient to reaffirm the views expressed in previous decisions concerning the need for the Bureau to comply with state law when it applies to the state for a right to appropriate water of the state. See Decision 990 approving applications of the Bureau for the CVP and Decision 1379 exercising jurisdiction reserved in Decision 990.

## Summary

There is unappropriated water available to satisfy the demands of the project as proposed. However, the Bureau has no definite plan as to when or at what specific locations project water will be used for consumptive purposes outside the four basin counties, and it has sufficient surplus water from other sources to meet future increased demands outside these counties for a long period of years. Permits should not be issued for use of water outside these counties at this time.

The public interest requires that the use of the Stanislaus River for whitewater boating, stream fishing and wildlife habitat be protected to the extent that water is not needed for other beneficial uses. Therefore, although there is a demonstrated need for the full yield of the project in the four basin counties at some time in the future,

but for which no contracts have been negotiated, and in view of the adverse effect the proposed reservoir will have upon these recreational uses, impoundment of water to satisfy that need should not be permitted at this time. Instead, the Board should retain jurisdiction over the permits for the purpose of approving incremental appropriations for consumptive use up to the quantities covered by the applications when the need for the water is substantiated.

Appropriations by storage should be allowed of sufficient water to provide for the preservation and enhancement of fishlife up to 98,000 afa. Storage should also be allowed to meet TDS objectives of 500 ppm and DO objectives as required by the Interim Water Quality Control Plan. The Board should retain jurisdiction for the purpose of conforming the permits to demonstrated needs for water for such purposes. Storage of water should also be allowed to replace water stored in the existing Melones Reservoir which will be inundated. The season of diversion to storage should conform to the availability of unappropriated water; namely, November through June.

Beneficial use of project water can be made for the generation of power. However, preservation of the existing upstream reach of the river for recreation values conflicts with increased storage for power purposes. Therefore, storage for power generation should be approved, but limited to the amount authorized for other project purposes.

By dedicating the initial project yield to demonstrated needs for flows for water quality control and for fish and wildlife preservation and enhancement and allowing use of these flows for power generation, and by deferring significant impairment of upstream recreational values until a need for other uses is demonstrated, the Board's decision assures the maximum public benefit and maximum utilization of the available resources in the public interest.

From the foregoing findings, the Board concludes that Applications 14858 and 14859 should be assigned to the Bureau; that they

and Applications 19303 and 19304 should be approved in part and that permits should be issued to the Bureau subject to the limitations and conditions set forth in the order following:

## ORDER

IT IS HEREBY ORDERED that Applications 14858 and 14859 be, and they are, assigned to the United States Bureau of Reclamation, subject, in conformity with Section 10505 of the Water Code, to any and all rights of any county in which the water sought to be appropriated originates to the extent that any such water may be necessary for the development of such county.

IT IS FURTHER ORDERED that Applications 14858, 14859, 19303 and 19304 be approved in part, and that permits be issued to the United States Bureau of Reclamation subject to the following conditions and limitations:

1–a. The water appropriated under the permit issued pursuant to Application 14858 shall be limited to the quantity which can be beneficially used and shall not exceed 980,000 acre-feet per annum by storage to be collected from November 1 of each year to June 30 of the succeeding year. Until further order of the State Water Resources Control Board, the water shall be used only for preservation and enhancement of fish and wildlife, recreation and water quality control purposes.

1–b. The water appropriated under the permit issued pursuant to Application 14859 shall be limited to the quantity which can be beneficially used and shall not exceed 6,000 cubic feet per second by direct diversion to be diverted from January 1 to December 31 of each year and 980,000 acre-feet per annum by storage to be collected from November 1 of each year to June 30 of the succeeding year to be used for power purposes.

1–c. The water appropriated under the permit issued pursuant to Application 19303 shall be limited to the quantity which can be beneficially used and shall not exceed 1,420,000 acre-feet per annum to be collected from November 1 of each year to June 30 of the succeeding year to be used for power purposes.

1–d. The water appropriated under the permit issued pursuant to Application 19304 shall be limited to the quantity which can be beneficially used and shall not exceed 1,420,000 acre-feet per annum by storage to be collected from November 1 of each year to June 30 of the succeeding year. Until further order of the State Water Resources Control Board, the water shall be used only for preservation and enhancement of fish and wildlife, recreation and water quality control purposes.

2. Until further order of the Board, permittee shall impound in New Melones Reservoir only such water as is necessary to provide (a) not in excess of 98,000 acre-feet per annum for the preservation and enhancement of fish and wildlife to be released at a rate specified by the California Department of Fish and Game, plus (b) such additional water as is necessary to maintain the water quality conditions set forth in paragraph 5. The above amounts are in addition to water stored for satisfaction of prior rights at existing Melones Reservoir and for flood control. No additional impoundment shall be allowed for power and recreational purposes. Further order of the Board shall be preceded by a showing that the benefits that will accrue from a specific proposed use will outweigh any damage that would result to fish, wildlife and recreation in the watershed above New Melones Dam and that the permittee has firm commitments to deliver water for such other purposes. The Board reserves jurisdiction for the purpose of establishing dry year criteria at the time such impoundment is approved.

3. Before any water is impounded in New Melones Reservoir, permittee shall file with the Board a reservoir operation study showing the water level elevations required to provide the yield specified in paragraph 2. The study shall include details of the permittee's proposed reservoir clearing plan to show the manner in which clearing will

progress as additional storage is authorized. A reservoir operation schedule shall be submitted by the permittee which shall be subject to approval of the Board. The study shall be updated at least once every five years until further order of the Board.

4. Permits issued pursuant to Applications 14858 and 19304 shall authorize the use of water for consumptive purposes only in the counties of Stanislaus, Calaveras, Tuolumne and San Joaquin. A petition to amend the permits to include other specific areas will be considered by the Board upon a showing that water from other CVP sources is not available to serve such areas. Any use of water for consumptive purposes outside the counties of Stanislaus, Calaveras, Tuolumne and San Joaquin that may be authorized later shall be subordinate to beneficial use within said counties and shall terminate when contracts are executed and the water is needed for beneficial use within said counties.

5. Releases of conserved water from New Melones Reservoir for water quality control purposes shall be scheduled so as to maintain a mean monthly total dissolved solids concentration in the San Joaquin River at Vernalis of 500 parts per million or less and a dissolved oxygen concentration in the Stanislaus River as specified in the Water Quality Control Plan (Interim), San Joaquin River Basin 5C, State Water Resources Control Board, June 1971.

In the event that the Water Quality Control Plan (Interim) is amended or superseded, the foregoing water quality objectives shall be modified to conform to then current criteria.

6. The State Water Resources Control Board reserves jurisdiction over these permits for the purpose of revising water release requirements for water quality objectives and fish releases and for establishing dry year criteria pursuant to studies to be conducted by the permittee and other parties in an effort to better define water needs.

7. Permittee shall file with the Board at least biennially a report of water diversions and use along the Stanislaus River and San Joaquin River between New Melones Dam and the Vernalis gage which will show any increased diversions subsequent to the beginning of releases of water under this permit, which diversions may be encroaching on the water supply provided for preservation and enhancement of fish and wildlife and for water quality control, and will show what steps, if any, permittee is taking to prevent any such encroachment.

8. Permittee shall file with the Board an annual report showing (a) daily storage level in New Melones Reservoir, (b) daily record of total dissolved solids at Vernalis, and (c) daily record of minimum dissolved oxygen level for the day at Ripon or at an alternate location approved by the Board.

9. The maximum quantities stated herein may be reduced in the license if investigation warrants.

10. Construction work shall be completed on or before December 1, 1980.

11. Complete application of water to the uses authorized by the permit shall be made on or before December 1, 1990.

12. Progress reports shall be submitted promptly by permittee when requested by the State Water Resources Control Board until license is issued.

13. All rights and privileges under this permit, including method of diversion, method of use, and quantity of water diverted, are subject to the continuing authority of the State Water Resources Control Board in accordance with law and in the interest of the public welfare to prevent waste, unreasonable use, unreasonable method of use, or unreasonable method of diversion of said water.

This continuing authority of the Board may be exercised by imposing specific requirements over and above those contained in this permit with a view to minimizing waste of water and to meeting the reasonable water requirements of permittee without unreasonable draft on the source. Permittee may be required to implement such programs as (1) reusing or reclaiming the water allocated; (2) restricting diversions

so as to eliminate agricultural tailwater or to reduce return flow; (3) suppressing evaporation losses from water surfaces; (4) controlling phreatophytic growth; and (5) installing, maintaining, and operating efficient water measuring devices to assure compliance with the quantity limitations of this permit and to determine accurately water use as against reasonable water requirements for the authorized project. No action will be taken pursuant to this paragraph unless the Board determines, after notice to affected parties and opportunity for hearing, that such specific requirements are physically and financially feasible and are appropriate to the particular situation.

14. This permit does not authorize collection of water to storage outside of the specified season to offset evaporation and seepage losses or for any other purpose.

15. Permittee shall allow representatives of the State Water Resources Control Board and other parties, as may be authorized from time to time by said Board, reasonable access to project works to determine compliance with the terms of this permit.

16. In compliance with Section 5943 of the Fish and Game Code, permittee shall accord to the public, for the purpose of fishing, reasonable right of access to the waters impounded by the dam under this permit during the open season for the taking of fish subject to the regulations of the Fish and Game Commission.

17. Permittee shall install and maintain an outlet pipe of adequate capacity in his dam as near as practicable to the bottom of the natural stream channel, or provide other means satisfactory to the State Water Resources Control Board, in order that water entering the reservoir which is not authorized for appropriation under this permit may be released.

18. In accordance with the requirements of Water Code Section 1393, permittee shall clear the site of the reservoir of all structures, trees, and other vegetation which would interfere with the use of the reservoir for water storage and recreational purposes. This provision, however, shall not preclude the permittee from retaining vegetation cover in selected areas as required for the protection of wildlife. Clearing operations shall be coordinated with authorized increases in storage levels.

19. Rights under this permit are, and shall be, subject to existing rights determined by the Stanislaus River Adjudication Decree of Superior Court of San Joaquin County dated November 14, 1929, Action No. 16873 with Supplemental Decrees dated February 24, 1930; March 8, 1934; May 8, 1935 and November 29, 1960, insofar as said adjudicated rights are maintained, and such other rights as may presently exist.

20. The quantity of water diverted under this permit and under any license issued pursuant thereto is subject to modification by the State Water Resources Control Board if, after notice to the permittee and an opportunity for hearing, the Board finds that such modification is necessary to meet water quality objectives in water quality control plans which have been or hereafter may be established or modified pursuant to Division 7 of the Water Code. No action will be taken pursuant to this paragraph unless the Board finds that (1) adequate waste discharge requirements have been prescribed and are in effect with respect to all waste discharges which have any substantial effect upon water quality in the area involved, and (2) the water quality objectives cannot be achieved solely through the control of waste discharges.

21. In order to prevent degradation of the quality of water during and after construction of the project, permittee shall file immediately a report pursuant to Water Code Section 13260 and shall comply with any waste discharge requirements imposed by the California Regional Water Quality Control Board, Central Valley Region, or by the State Water Resources Control Board.

22. Before making any change in the project determined by the State Water Resources Control Board to be substantial, permittee shall submit such change to the Board for its approval in compliance with Water Code Section 10504.5(a).

902

23. This permit shall be subject to appropriation by storage upstream from New Melones Reservoir for stockwatering and recreational purposes, provided the individual capacities of reservoirs for such purposes do not exceed 10 acre-feet and the reservoirs are kept free of phreatophytes.

24. This permit shall be subject to the following agreements between the permittee and other parties:

(a) The "Agreement and Stipulation" dated October 24, 1972 and executed by the permittee, Oakdale Irrigation District and South San Joaquin Irrigation District.

(b) The agreement between the permittee and Tuolumne County Water District No. 2 dated November 29, 1972.

(c) The agreement dated July 31, 1972 between permittee and Calaveras County Water District.

Reference to the above three agreements shall not be construed as a finding by the State Water Resources Control Board with respect to the rights of any of the parties involved.

25. This permit does not authorize the use of any water outside the counties of origin which is necessary for the development of the counties.

IT IS FURTHER ORDERED that the hearing on this matter will be reconvened not later than July 1, 1986 for the purpose of considering the status of the items of reserved jurisdiction.

Dated: April 4, 1973

/s/ W. W. Adams
W. W. Adams, Chairman

/s/ Ronald B. Robie
Ronald B. Robie, Vice Chairman

/s/ E. F. Dibble
E. F. Dibble, Member

/s/ Roy E. Dodson
Roy E. Dodson, Member

/s/ Mrs. Carl H. Auer
Mrs. Carl H. (Jean) Auer, Member